# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DAVID YOUNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-4055-WEB/KGG |
| ) | |
| THE GOODYEAR TIRE & ) | |
| RUBBER COMPANY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM & ORDER

NOW before the Court is the Motion for Preliminary Injunction (Doc. 16) filed by Defendant The Goodyear Tire & Rubber Company ("Goodyear"). Goodyear requests an Order, in part, restraining Plaintiff David Young from being employed by Continental Tire The Americas, LLC ("Continental"). Goodyear contends that Plaintiff possesses its confidential/trade secret information and would be irreparably harmed by Plaintiff working for Continental. Plaintiff and Continental both oppose the motion (Docs. 28, 29). Following a July 12, 2011, hearing regarding the motion, this Court entered an initial Minute Order denying Goodyear's motion (Doc. 33, text entry) stating a written opinion would follow.

The present Order is that written opinion.

## BACKGROUND

Plaintiff is a former employee of Defendant Goodyear. He filed this action requesting a declaratory judgment that his non-competition agreement with Goodyear will not prevent his employment with a competitor, Defendant Continental. Goodyear filed a counter-claim for enforcement of the agreement, and added Continental as a party. Goodyear now moves for a Preliminary Injunction to enforce the agreement during the pendency of this action.

The Court has considered testimony and evidence presented by the parties, as well as argument of counsel and submitted legal memoranda. As such, the Court finds that Goodyear has failed to prove that it will suffer irreparable injury without the requested injunction. Its sole argument is that the plaintiff possesses confidential information which will harm Goodyear in the hands of its competitor. However, the evidence proves no more than the Plaintiff's general knowledge and management experience. Further, because Goodyear's argument – that it has a sufficient business interest to justify the enforcement of the agreement – relies on the same concern for confidential information, the evidence also fails to establish the likelihood of success on the merits for the counter-claims and cross-claims. Goodyear's motion is, therefore, **DENIED**.

## BACKGROUND

**A.     Plaintiff's Employment with Goodyear**.

Plaintiff, who holds a Bachelor's degree in history from Washburn University and is a lifelong resident of the Topeka, Kansas area, began his employment at Goodyear's Topeka facility ("the facility") in September 2002 as a non-union, hourly employee.  At the time of his hire, he had no experience in the tire industry.  At the commencement of his employment, he was asked to sign a patent, copyright, and secrecy agreement, which is dated October 2, 2002.  (Exh. 101; "confidentiality agreement".)  Within a couple weeks of his hire, Plaintiff was promoted to the position of Area Manager, the lowest-level management position at the facility.  Plaintiff remained in this position, without further promotion, until he resigned from Goodyear in May 2011.

In conjunction with his promotion to Area Manager, Plaintiff was required to sign Goodyear's "Associate Confidentiality and Intellectual Property Agreement."  (Exh. 102, "ACIPA.")  The ACIPA was executed by Plaintiff on October 11, 2002 – nine days after he signed the confidentiality agreement.  (*Id*.)  The ACIPA is, as its title suggests, a tool for the protection of confidential information and intellectual property.  Much of this five-page, single-spaced document focuses on defining such information, determining the owner of intellectual property, and committing the employee to the protection of confidential

information. Section 4 of the agreement, entitled "Prohibited Services to a Conflicting Business Unit," prohibits the employee from working for a "conflicting business unit" for two (2) years without the permission of Goodyear. (*Id*., at pg. 4.) At the time of Plaintiff's hire, hourly employees (which Plaintiff estimates to currently number 1500) were not required to sign the ACIPA. Goodyear contends, however, that all employees – hourly as well as salaried – are now required to sign the agreement.

The ACIPA also includes a process for requesting a waiver of this prohibition. (*Id.*) The waiver process states that if the employee's written request for a waiver "is not sufficient to enable Goodyear to grant the waiver, you and Goodyear will exchange facts, circumstances, ideas and opinions regarding the proposed services to be rendered." If Goodyear determines that the employee's "best opportunities outside of Goodyear for advancement in your profession or trade are limited to potential employment or association with a ***Conflicting Business Unit***," the company, "in its sole discretion, may elect to require deferment of your employment" with such conflicting business. (*Id*., emphasis in original.) Under such circumstance, and pursuant to the terms of the ACIPA, Goodyear "will, so long as you diligently seek alternative work," pay such employee 125% of their compensation at Goodyear. (*Id.*)

Over the course of Plaintiff's continued employment with Goodyear, he

served as an Area Manager in several different departments of the facility, including curing (from March - October 2003) and component preparation (January - November 2007). From December 2007 through January 2009, Plaintiff participated in the tire room "special assignment," relating to a $20 million upgrade on several of Goodyear's tire machines. Plaintiff testified that the overriding accomplishment of this assignment was safety, rather than production, related. He took this assignment in an effort to grow with the company and improve his chances of advancement. He conceded that one purpose of the assignment was to improve Goodyear's production processes. Plaintiff was, however, removed from the assignment in January 2009.

From that time until his resignation, Plaintiff served as an Area Manager in Tire Assembly. In this position, he supervised and managed the work and pay of hourly employees in that section of the facility. He also served occasionally as a substitute Shift Operations Manager in which he oversaw plant operations in "all 4 business centers" of the facility – mixing, component prep, radials, and curing. He also monitored the Goodyear Operating System ("GOS", discussed below), which he described as a follow-up to make sure GOS was implemented.

**B.  Plaintiff's Hiring by Continental**.

In February 2011, Plaintiff was contacted by an employment recruiter regarding a position available with Defendant Continental. The position, as

described, is

> [r]esponsible for the management, direction, and coordination of all aspects of the Tire Operation, including quality and quantity, setting and achieving plant goals, personnel functions, waste control, production costs, safety, manning, scheduling, financial planning and budgeting, and assuring adherence to plant procedures and policies. Also involved in planning of Capital expenditures and Process Improvements.

(Exh 104).

Plaintiff had his first interview with Continental in April of 2011, at the company's facility in Mt. Vernon, IL. Thereafter, the recruiter asked Plaintiff if he had a noncompete agreement with Goodyear. Plaintiff contacted Barb Vogel, who worked in Human Resources at Goodyear's Topeka facility. Ms. Vogel stated that she did not know if Plaintiff had entered into a noncompete agreement with Goodyear, but would check. By e-mail dated April 28, 2011, with the subject line "Non-compete," Ms. Vogel informed Plaintiff, "I looked in your file and there is the usual secrecy agreement, but I do not find a non-compete." (Exh. 105.) He did not ask Ms. Vogel for a copy of this "secrecy agreement." Because he dealt with union and personnel issues in his job, he assumed the "secrecy" aspect related to personnel confidentiality. He did not inform Continental of this "secrecy agreement." He testified that he relied on this representation from Goodyear's

Human Resources department in deciding to accept employment with Continental.[1]

By e-mail dated May 3, 2011, Plaintiff received an offer of employment from Continental. Plaintiff testified that he accepted the offer from Continental "the next day" – May 4, 2011. He does not believe that he had received anything from Continental regarding their confidentiality/trade secret policy prior to the offer of employment. He did, however, execute Continental's "Property, Confidential Information, Trade Secrets & Inventions Agreement" on May 5, 2011, which was faxed to Continental on May 6, 2011. (Exh. 106.)

Plaintiff presented Goodyear with a letter of resignation dated May 3, 2011. (Exh. 107), and also resigned by e-mail dated May 4, 2011. On May 5, 2011, Plaintiff was told by Human Resources Manager Charles Hollis that he was, in fact, subject to a noncompete agreement. Hollis forwarded Plaintiff a copy of the ACIPA he signed in 2002 along with a waiver request form. (Exh. 109.) Plaintiff was instructed to submit the completed waiver request form to Bruce Hendricks, an attorney at Goodyear's headquarters in Akron, Ohio.[2]

Also on May 5, 2011, Plaintiff completed the "Associate Confidentiality &

---

[1] Plaintiff urges these facts effect an *estoppel*, barring Goodyear from enforcing the agreement. Because of the other rulings herein, the Court finds it unnecessary to address this defense in this Order.

[2] This e-mail also indicates that Goodyear had, by that time, accepted Plaintiff's resignation. (Exh. 109.)

Intellectual Property Agreement Waiver Request Form." (Exh. 111.) In the form, Plaintiff disclosed that he had a "formal face-to-face interview" with a conflicting business on April 19, 2011. (*Id.*) He listed his "major job responsibilities at Goodyear as "manage schedules, payroll administration, discipline, implementing goals, tracking performance, and run day to day operations." (*Id.*) In the form, Plaintiff stated that the position offered at Continental is "very similar [to that at Goodyear] except that the [Continental] facility . . . produces passenger tires." (*Id.*) He also stated "[t]he machinery is different as well as the process." He continued that "[t]he only services that I am providing to the Conflicting Business Unit is [sic] follow goals and procedures that are already predetermined. The job is the same as I have done at Goodyear . . . the exception is that it is at a higher level." (*Id.*)

In response to the form's inquiry regarding possession of Goodyear's confidential information, Plaintiff responded "[n]one. I only manage process and people. I wasn't involved in tire development or design of machinery." (*Id.*) Plaintiff also testified at the hearing that he has no knowledge or information regarding confidential information belonging to Goodyear. He also testified that he would have no knowledge from Goodyear that would be useful or relevant to Continental's tire production machines because they were completely different

than those used by Goodyear.[3]

Plaintiff subsequently spoke to Mr. Hollis and Plaintiff contends he was informed there was a "99% chance" the waiver would be denied. Plaintiff also spoke with Bruce Hendricks regarding a waiver request. He was not, however, given an opportunity to meet with Hendricks. Plaintiff was not asked by Hollis or Hendricks about the nature of his job with Goodyear, what types of information he had been exposed to at Goodyear, or if he had any trade secret information that could adversely impact Goodyear.

Hollis and Hendricks discussed Plaintiff's role with Goodyear, and that they both individually spoke with the Topeka Plant Manager regarding Plaintiff. Hollis and Hendricks both admitted that they did not review Plaintiff's performance evaluations in the determination of whether he would have confidential information. Plaintiff's shift operation manager was not contacted.

Hendricks spoke to Plaintiff for approximately 20 minutes. Although he took a few notes regarding his investigation process, those notes were all subsequently shredded by Hendricks. On May 18, 2011, the waiver request was denied. (Exh. 111.) Continental received a copy of Goodyear's ACIPA signed by Plaintiff by May 20, 2011. (Doc. 112.)

---

[3] Continental's Human Resources Manager testified that Continental has its own proprietary machines for tire production.

On May 23, 2011, counsel for Plaintiff sent Goodyear's attorney a copy of Continental's "Property, Confidential Information, Trade Secrets & Inventions Agreement," which, in relevant part, requires that Continental's new hires "shall not knowingly disclose to Employer or induce Employer to use any Confidential Information or Trade Secrets belonging to others." (Exh. 113.) As stated above, Plaintiff had previously executed and submitted this form agreement to Continental. (Exh. 106.) By e-mail dated May 24, 2011, counsel for Goodyear informed Plaintiff's counsel that Continental's confidential information agreement is "insufficient to protect Goodyear's interests." (Exh. 114.) Defense counsel requested that he be informed by June 1, 2011, "whether Mr. Young intends to return to his job at Goodyear." (*Id*.) Plaintiff's counsel requested an additional week for Plaintiff to make this decision. (Exh. 115.)

Plaintiff testified that although he knew he wanted to go to work for Continental and did not want to return to Goodyear, he had to consider his options. He started his employment with Continental on or about June 8 or 9, 2011, and worked only two days. After Goodyear filed the counterclaim, the parties, in lieu of a Temporary Restraining Order, agreed to suspend Plaintiff's work for Continental until the present motion could be decided.

**C.**     **The "Lean" Management Philosophy and Goodyear Operating System**.

"Lean" is a corporate management philosophy generally credited to the

Toyota Production System. Goodyear's Production Manager, Kevin Pfeiffer, testified that Goodyear did not invent the concept of lean manufacturing and that it has been around for decades. Pfeiffer described "lean" as a "pull" system in which production is driven by customer requirements, as opposed to a "push" system in which manufacture is maximized and product "pushed" to distribution and sales. The system includes finding ways to minimize waste and inventory, both in finished product and in raw materials. At Goodyear, the implementation of lean included a review and revision of processes in every business unit, including tire assembly where plaintiff worked. The evidence established that, at Plaintiff's level of employment, the program resulted in changes to the process designed to improve efficiency. These were not large changes, but included production changes such as shortening the "change over" time take to switch the line from one product to another, and placing material closer to the user. Pfeiffer testified these little, "incremental" changes could add up to important savings. It is Plaintiff's knowledge of, and experience with, these changes that Goodyear claims as justification for both the Preliminary Injunction and for enforcement of the agreement. According to Pfeiffer, "everything" Plaintiff does at Goodyear should be considered confidential information. Pfeiffer did not, however, have any knowledge as to how any other tire companies have integrated lean philosophies into their production processes.

As stated above, Plaintiff was an Area Manager in the tire assembly area of the Topeka facility, which are the lowest level managers at the facility. Although he was salaried, Plaintiff's hours were tracked and he was paid overtime. There were three levels of management between Plaintiff and the Plant Manager. His primary duty was directly supervising the hourly workers who operated the machines that made the tires, and communicating with the tire prep area, which made tire components, to ensure the proper flow of supply. He reviewed employees' hours worked and credited their pay. He could impose discipline on the employees he managed, but only with the prior approval of the Human Resources Department. He had no authority to hire employees. Plaintiff was not involved in the design of the machines or in the design of the work place system in his section. He was not involved in decisions about manning in his area. Plaintiff was not involved in devising process changes to comply with "lean" principals, although he did implement efficiency changes devised by others. (*See e.g.*, Exhs. 203, 204, 205, Plaintiff's performance evaluations for 2008, 2009, and 2010.)

Plaintiff participated in training on the principals of "lean" as part of a program titled the "Goodyear Operating System" ("GOS"). This training taught employees basic principals of lean management, and made some general application to the Topeka plant. All employees, even the hourly workers, participated in this training. Plaintiff had various documents in his possession after

he stopped working at Goodyear, none of which were marked "confidential," or "trade secret." One was a paper copy of a portion of a PowerPoint training presentation that was provided to all employees (hourly and salaried) for training regarding GOS. The slides are general in nature and there is no evidence that they were intended to be confidential or protected as such.[4]

The higher-level management team developed a written plan for the plant based on "lean" principals. Goodyear does not claim that Plaintiff has a copy of this plan or intends to misuse it or disclose it to Continental. In fact, no evidence has been presented that Plaintiff ever even saw this plan. To the contrary, Pfeiffer testified that the document, which consists of 30-40 pages (and has not been produced in this litigation), is kept at the production management level and higher. Plaintiff did not participate in the development of the lean plan. Further, Pfeiffer agreed that knowledge of the entire process would be necessary for it to be of any real use, but that since the plan was implemented, Plaintiff's involvement in the process had been limited only to the tire assembly area.

**D.     Testimony of Michael Burns**.

Plaintiff also proffered the deposition testimony of Michael Burns, a former

---

[4] Plaintiff testified that no one at Goodyear asked to go through his bag or belongings to search for confidential or trade secret information when he left the facility after resigning. He also was not asked by anyone at Goodyear at the time of his resignation if he had any such information.

employee of Defendant from 1982-2008.  Burns testified that his employment was terminated by Defendant and that he still does not know the reason. (The Court admits Burns' Separation Agreement (Exh. 120) as evidence over Plaintiff's objection.)  Although Burns' credibility is affected by the circumstances surrounding his departure from Goodyear, the Court finds his testimony believable and helpful in some respects.

Burns' final job with Defendant was as an operations manager in tire assembly department of the Topeka facility.  He had worked at that facility for the last five years of his employment with the company.  Prior to coming to Topeka, he had worked at numerous Goodyear facilities in various capacities, including as a tire room manager, receiving manager, an auditor/process specialist/first line manager, and in the technical and manufacturing organizations.  The Topeka facility was the second-oldest of the Goodyear plants at which Burns worked. Burns is now employed by Cooper Tire, a competitor of Defendant.

As an operations manager for Goodyear, 12 area managers, including Plaintiff, reported to Burns.  He testified that interacted with Plaintiff on a daily basis.  He also stated that he was at a higher pay grade than Plaintiff and would have had more access to confidential information and the technology portion of the production process.  Even so, Burns testified that employees in production, including himself and Plaintiff, basically "run the specs that are put in front of us . .

. we're chasing stock and managing people. So there's not much we do around technology other than trying to keep machines running, people working." He testified that Plaintiff "absolutely [did] not" participate in the design of any manufacturing equipment, tires, computer controls, and lean manufacturing, nor would Plaintiff have had the access or ability to modify any of the steps in the manufacturing process or computer system. Plaintiff also would "absolutely not" have had access to the mixing and construction specifications for tires, according to Burns. Burns admitted, however, that he would have no firsthand knowledge of Plaintiff's job duties after September 2008 (when Burns' employment was terminated). He also had no recollection of Plaintiff's special assignment relating to the tire room machine upgrade.

Burns testified that the job of Defendant's managers was to "manage people and chase stock," which is not confidential and unique to Goodyear. According to Burns, he and Plaintiff would not have been involved in determining which tires to build or which machines to run or calculating how many tires to build. Burns does not believe he possessed any confidential or trade secret information when he left Defendant's employment and testified that Cooper Tire (his current employer) never asked him to disclose any information relating to Goodyear.

## DISCUSSION

The limited purpose of a Fed.R.Civ.P. 65 preliminary injunction is "merely

to preserve the relative positions of the parties until a trial on the merits can be held." *University. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).  Because "a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. University of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).  A party requesting a preliminary injunction must establish that:  "(1) [he or she] will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir.2003)).

In the analysis of these factors, courts consistently hold that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).  When the movant has prevailed on the first three factors, "the Tenth Circuit generally uses a liberal standard for 'probability of success on the merits,' so the moving party need only

raise 'questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Universal Engraving v. Duarte*, 519 F.Supp.2d 1140, 1148 (D.Kan 2007).

Based on the testimony presented by the parties, the Court's analysis will focus on the issues of "irreparable harm" and "likelihood of success on the merits."

> 'To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'' Irreparable harm is more than 'merely serious or substantial' harm. This requirement is met by a plaintiff demonstrating that there is a significant risk of harm that cannot be cured by monetary damages. The party seeking the preliminary injunction bears the burden to show that 'the injury complained of is of such imminence that there is a clear and present need for equitable relief.' Irreparable harm is the most important factor in obtaining a preliminary injunction. 'Loss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm.' Unfair competition resulting from a breach of covenant not to compete is likely to constitute irreparable harm. On the other hand, wholly conclusory statements alone will not constitute irreparable harm.

*Id*. (internal citations omitted).

In this case, proof of the likelihood of success on the merits requires Goodyear to establish that the non-compete clause will be enforceable. Assuming the application of Ohio law, as elected in the Contract and urged by Goodyear, "[a] noncompete clause will be found to be reasonable only where the employer

can show by clear and convincing evidence that the restrictions imposed by the non-compete clause (1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public." ***Brentlinger Enterp.***, 752 N.E.2d at 998 (citing ***Raimonde v. Van Vlerah***, 325 N.E. 2d 544, 546-548 (Ohio 1975).  Such an agreement amounts to a restraint of trade, and will be enforced only to the extent that the restraints are reasonably necessary to protect the employer's legitimate business interests.  *Id.*[5]

The context of the non-compete clause at issue (which is part of the parties' overall agreement) evidences the protection of confidential information, including intellectual property and trade secrets, as the underlying basis for the non-competition agreement.  Furthermore, Goodyear's counterclaim, and its motion for preliminary injunction, rely on the protection of confidential information as the basis for its argument that the agreement is enforceable as well as the basis for its claim that irreparable injury will result from the disclosure of such confidential information in the absence of a Preliminary Injunction.  Therefore, the Court will evaluate the evidence to determine whether Goodyear has proven that Plaintiff has

---

[5] Plaintiff disputes the enforcement of the Ohio forum selection clause and urges the application of Kansas law.  However, in requiring the demonstration of a legitimate business interest to enforce the agreement, the law of the two States is in concert. *See generally* ***Weber v. Tillman***, 259 Kan. 457, 913 P.2d 84 (1996).

confidential information which will cause it irreparable harm if he is allowed to work for Continental, and whether he has sufficient confidential information to support the enforcement of the noncompete provision of the ACIPA.

Plaintiff does, of course, know much about how the Topeka Goodyear facility operates, at least in regard to the area in which he worked.  The evidence, however, is that this knowledge is specific to the Topeka plant, its product, and its machines.  No evidence has been presented that this knowledge would be useful to Continental.  Although Plaintiff has substantial and valuable general management skills which he developed at Goodyear, it is doubtful that these could support a Protective Order, and neither the contract nor Goodyear's arguments advance this general experience as a basis for enforcement of the noncompete provision of the ACIPA.  Aside from "wholly conclusory statements" by Goodyear, there is no evidence that Plaintiff possesses important confidential information concerning operations sufficient to support enforcement of the contract, or that because of any such confidential information Goodyear will suffer irreparable harm if Plaintiff begins work at Continental during the pendency of this case.

Defendant's Motion for Preliminary Injunction (Doc. 16) is, therefore, **DENIED**.

Dated at Wichita, Kansas, on this 28th day of July, 2011.

                          S/ KENNETH G. GALE
                          KENNETH G. GALE
                          United States Magistrate Judge